Good morning. May it please the Court. Gordon Callen from Reno, Nevada, for Plaintiff Appellant Laura Leigh. Thank you for putting me on this calendar, and I know it's a crowded calendar as well. This very Court in April of last year said that the independent press is the guardian of the public interest, and the independent judiciary is the guardian of the free press. And somewhere along the way in this process, in this case, we've lost that concept. The case is simple. It's a photojournalist. She's credentialed with Horseback Magazine. It may not be the New York Times, but she's credentialed nevertheless, and she covers wild horse roundups, BLM roundups, shelter roundups at Fish and Wildlife Service. Sotomayor Before we get into the merits, let me just ask you, do plaintiffs' claims become moot after December 31st? Well, hopefully not. That's for you to decide. If you were to take the final record decision and say that when it expires December 31st, and, yeah, that's it, then, yeah, mootness would apply. But there seems to be a couple of exceptions here, okay? One is that it's the law to conduct any more roundups. I mean, you would concede that the government doesn't have the right after the -- after December 31st to conduct any more roundups in this law, in this area. In other words, if they tried to do another gather in January, they could be stopped because that exceeds the term of the record of decision, right? Of the record of decision. Yeah. That's true. But you know what they did in this case, and you saw that in the record, is that back in February, their wild horse and burro specialist, who admitted that he was the most knowledgeable person from the BLM, said, when asked, are you over AML? AML means appropriate management level. It's an acronym that the BLM uses for population study. And he says, yes. Does that mean you have to take them off? And I'm paraphrasing, but it's in the record clearly. The answer is yes. And if you don't take them off in 2013, does that mean you're going to have to do a new record of decision and get them off right away in the near future? Yes. And he says, yes, I've got to take them off legally. Yes. Right. I mean, but they still have to do another record of decision. That's the question. Yes. And I realize that this may seem like it fits the repetition, but evade and review. But there is a public comment period in that. Why doesn't it become moot for this particular roundup? Well, I do think that the two exceptions do apply here. And the reason really is a factual one in this instance, and that is that when the decision came down July 19th, denying preliminary injunctive relief, the Wild Horse roundup at Silver King was on a list of roundups. Right. But they had the under the record of decision, they had the right to do that. Sure they did. But then they took it off when this notice of appeal came out. Right. Notably. Well, this case has been going on for a long time. It's been up here before. Yes. Went back. It looks like you all took time to try to settle, and that was unsuccessful. Then the district court had an evidentiary hearing, heard, I don't know, ten witnesses, and then made a decision. And then here we are about three weeks, four weeks before the end of this period. And I just don't know what the likelihood of this, any roundup occurring between now and the end of the year, and then after the beginning of the year, and there's got to be a new record made, and there is a public comment period. So I'm just trying to figure out why isn't this moot? It seems that it's been intentionally taken off the calendar. You have a witness from the BLM at a hearing who said, and you know what he said. But I mean, talk to me about the law. I mean, what law dictates that we would go ahead and decide this with less than four weeks left in this remaining period? I understand. The Court did it in five weeks last time, by the way. But the Court took five weeks. I'm not sure I understand what you mean. In the time that this case was last argued when I was here last time. In Labor v. Salazar, the first time around, five weeks to the decision. Right. I'm sorry, Your Honor. Five weeks to the opinion. This is here on a preliminary injunction. Is that right? Yes. It's been floating around on a preliminary injunction for a long time. If I remember the Labor v. Salazar case, Judge Wallace suggested that this is all a waste of time. Go to trial and get it over with. I mean, why have we been stuck in the preliminary injunction mode? Why didn't you just go to trial on this thing? Well, there was an automatic. Well, there was not an automatic, but there was a requested stay up until the first time that this matter came out to this Court. And after that, when this Court remanded it for further instructions, nothing else happened other than deciding this case. And then we had a hearing back in February. Yeah, you had your ---- And it took five minutes for that. You had your evidentiary hearing. Did you put on the people who drafted the press restrictions that you're complaining about? Were those people called to the stand? What press restrictions? Exhibit 500 or whatever it is. It says here's the way the whole thing works. You have to have appointments and all that stuff. Where did that come from? That's a BLM document. Did you at all conduct discovery or try to penetrate that and find out why that was written and who wrote it? You can't conduct a discovery in an administrative process. So you had no discovery at all. Did you call Bolstad to the stand to explain what his comment meant? Dean Bolstad, no. Dean Bolstad did not come into the courtroom to explain his e-mail for saying we're going to close this because this is a ---- Why didn't you call him as a witness? I mean, he seems to be your smoking gun in the entire case, doesn't he? I mean, the one that suggests that your allegations are correct, that this was done to try to close down your client from putting bad things on the Internet, like if it's bad enough for you wild horses? He is ---- You saw that. He is one of the smoking guns, but his e-mail is in evidence. It kind of struck me as odd that he wasn't called as a witness. Either side called him, I guess. You're right. I thought it was odd as well. But you would think ---- Why did you not call him? Because I've got the e-mail in evidence. I've got it in there. It's admitted. And so why mess it up when it's already in? The smoking gun is already in. And I'm surprised that they did not bring him. But anyway, yes, the witness point, you know, it's a tough issue. I understand that. But, you know, I mean, I also have a couple of good pieces of evidence here, which is recently, Mr. ---- well, the wild horse and burrow specialist's testimony says, yeah, we're going to remove him this year, and if not, we've got to do it next year. And then we also have that notice that says, yeah, we're going to remove. Oh, here's an appeal. Let's take it off the calendar. Doesn't that invoke one of these exceptions? Now, you're ---- what are you asking for? What is your client asking for? It still isn't clear to me. I mean, the district court thought it was unrestricted access, and you go way out of your way to say, no, it's not unrestricted access. But what I read in the record is very imprecise as to where your client believes that your client ought to be. You know, did you suggest or give the district court any particular language as to how this ought to read in your favor? Thanks, Your Honor. Yes, the client did. Here's what she said. I'm reading from excerpts of Record 186. What would you consider fair access? Right. Answer. It's a little long. Are you okay if I read it? I read it already, but I know what it says. Well, I saw images of wild horse roundups, and she's talking about prior ones when people had access. Calico, for example. She says, yes, I want the same photos, and she can't get them. For her to get that same photo, she continues to have to buy a longer focal length lens. It's just like playing a guitar if you're in a band and somebody takes the ---- So she wants a rule from the government that says you have to put me in a place where I can get photographs using my current long-range lens. No. She's asking for close enough access to be able to assess horses, okay? Because you can see that from a distance. You can see that from a distance. For example, what does that mean? What does that mean? In other words, in terms of distance. There's a scale out there. They call it a gap bar scale, and it's a quick way of, in the field, assessing what horses look like when they come off the range in a certain condition. It's their respiratory rate. Are they sweating? Are they out of sweat? So she wants to be right next to them. You don't have to be right next to them. How far away? How far away? Well, if it's 30 feet and you don't have snow fencing that blocks it up, that's probably sufficient. And how does that interfere with the process? How far was she away at the Silver King Gather? Well, I'll give you that answer as well. About 400 feet, roughly? No, longer than that. If you take volume 4 and just scan to the color photograph. I'll do it one more time. I've seen those photographs. They don't tell me anything in terms of distance. Yes, they will in the last photograph, in the photograph bottom page. Just give me one second. Volume 4? What page? I'm talking about 466. 468. 468. 466, 467, 468. And look at the bottom photograph. Now, the photograph. It doesn't say anything about distance. Well, what you see is you see the observers. You see the BLM person in charge of the observers. And somewhere out in the distance is the roundup. Do you see it? Yeah, these photographs are completely misleading in terms of how far you are away. I mean, photographs can show something up close. They can show something far away. These are little teeny photographs. I thought I read in here someplace where the observation point at this place was about 400 feet away. On one of them there was, but then there was also a hillside in the way, and so they couldn't actually see him coming in the trap. And when you talk, when you read the testimony from the person in charge of the observers, okay, he admits, and I can find it very quickly for you, he admits that, no, they couldn't see the horses coming into the trap, meaning that she could not assess the horses. So does she want to be right down next to the opening in the trap? She wants to be able to be able to see the trap such that she can see the condition of the horse. You don't need to be right next to it. Who gets to decide that, where she can be? She does. The BLM decides everything. So the BLM, so if the BLM says this is close enough for you to see, is that the end of it? Of course not. Oh, you mean if that's in terms of what she wants? Yes. What's happening now? In terms of what she wants. I mean, she wants to make the final decision as to where she can be at every stage of the gather, am I right? That's part of it, yes. But, you know, we're talking about a woman who does this. She's been in more horse gathers than any BLM or Department of Interior employee. Do you deny that this is dangerous stuff, wild horses, helicopters ranging all over the place? It sounds dangerous to me. It depends on... It looked dangerous on the website when I looked at the, is it bad enough for you, wild horses? Well, I tell you what, if you're the helicopter pilot, you're making it dangerous, aren't you? Well, what does that prove? Well, there's some ways that you can drive horses into a trap, and there's other ways that are a little more reasonable. That's not this case. So she wants to control how the helicopters work also? That's not this case. That's only the access case, and that's what we're talking about. So you're not stating a specific amount of feet or that she should be near, like, 100 feet? Well, you haven't been answering that question. So let me ask you another question, because I have some questions on whether or not the qualified right of access attaches to this government activity. And it's just the Press Enterprise 2 case permits the court to look to recent history as opposed to the common law. I'm asking you, does Press Enterprise 2 allow the courts to look to recent history as opposed to the common law or founding era to determine whether this qualified right of access attaches to this government activity? Sure, it does. At least it should be, because it should be a reasonable approach. But there's no other case. I'm trying to find a case that says it should be more recent rather than the traditional because in Globe and Richmond newspapers, that's a historical prong, and they go back to when the organic laws were adopted. So I want to reconcile that for myself to make sure that the test was applied correctly by the district court. Well, there's some gaping holes in this qualified right of access arena with Press Enterprise 2. And I can give you an example. There's another wild horse roundup that was conducted. Well, there was another case involving Sheldon Wildlife Refuge, and that's a U.S. Fish and Wildlife Service case. A TRO hearing was held for a day, and that court determined that there was no historic access to roundups at Sheldon. The Sheldon horses in that case are the ones that War Horse from the movie War Horse was made from. Sheldon horses went to World War I. They went to the Boer Wars alongside our fighting troops. And that's where those horses came from. Those horses go into slaughter today. It's not this case. But the example is that the district judge decided that there was no historical right of access in that case because she could not find something that was modernized. I mean, that seems to run against what you're saying. I'm sorry? Well, I mean, the question was what authority do you have for it, and you cite authority against you. I don't. Well, you know you're right, and you're going to find it anyway, but nevertheless. But the BLM seems to admit that your client has a First Amendment right of some kind to access this information. She does. They never denied that. She does, but they preclude her. You know, I mean, the long and short is this. You get rid of the camera, and you don't have a story. The district court clearly credited the BLM's testimony that this is dangerous activity, and it seems to me the BLM has a duty to warn and a duty to protect, and especially with FAA restrictions about helicopters and things like that. Wait a minute. I'm sorry. It seems to me that the BLM is well within its rights to trench somewhat on your unrestricted First Amendment claim by saying where these observers can be and where they can't be. I think the record is clear, Your Honor, that the – it's not a nilly-willy I want to be here or there right of access. It's an unrestricted right of viewing that, whatever that takes. But if the unrestricted – if unrestricted – if you set up the trap to be consistent with what they're trying to do to catch these horses, it may simply be that there is no vantage point from which that can be seen because it's terrain-driven. That was part of the problem at Silver King. You know, you have 80 percent of the land mass in Nevada is Federal property. So you're saying that they have to have the trap where it can be viewed by people like your client. Why not? It's a – it's a – it's public land, number one. It's a Federal public resource. Those are the wild horses. Congress passed both unanimously, House and Senate, the Wild Horses Free-Roaming Horses and Brewer Act of 1979. So the best places to have the trap, according to the BLM, have to be turned down because there's no hill close enough for your client to be able to get the kind of viewing access that she wants. Respectfully, I would say this. The best – the best traps for the BLM are places where they intentionally exclude the public from viewing and seeing what they actually do with the horses. And that's what's going on. You're down to about two and a half minutes. Do you want to reserve? Yes, I do. Thanks. Do you have another question? No. No, that's okay. Thanks. Thank you. May it please the Court. John Arbab for the Apple East. Your side seems to agree that she has some kind of a First Amendment right to view and to film these gathers. Am I right? Your Honor, we – in a footnote in our – in the red brief, we continue to disagree with the Press Enterprise's two tests. As Judge McGeough was suggesting, we do think that the proper way of looking at that would be to look at historic access. But nevertheless, you agreed in this case, you so argue, that she does have a – admit, the BLM admits that she has a qualified right to access this information. Your Honor, the district judge found that the plaintiff did meet the first step of the Press Enterprise's two tests. Well, I read BLM people as saying, we agree that she has a First Amendment right. Yes. All right. That's what I'm getting at. So your agency agrees she has a First Amendment right? Yes, but that's only the first step of the Press Enterprise's two tests. I really understand that. So you agree that the Press Enterprise two, you don't have to go do the historical founding era analysis in applying that test? Your Honor, I think that if it were open to revisit the orders that were given by the prior panel on remand, that we would say that the historical look has to be farther back than a few years. You're on appeal now. So what is your argument? Because it seems a little willy-nilly. It doesn't seem firm. And I want to be clear about what your position is. I think we all do. So you're saying that the District Court, on the qualified right to access, do you think that or are you conceding that the defendant has a qualified right to access? Or I guess the plaintiff here has the qualified right to access. We're not challenging the District Court's finding that she did. So you're saying that the District Court appropriately applied Press Enterprise two? Well, Your Honor, we're not challenging that finding.  We're not challenging that finding. We're not challenging the plaintiff's discretion and did not clearly err in finding that step two of the test was not satisfied by the plaintiff. Well, in fairness to me, you're just following what the prior panel decided, right? Well, we, BLM on remand, the government on remand, had to follow what the prior panel said. Right. I mean, you raised that argument before the prior panel. You said that there's no First Amendment right of access. And they said there is and remanded, right? That's right. I mean, that's where I took it. Yes, I mean, we are constrained. BLM was constrained on remand, certainly. But I thought that the first panel said apply Press Enterprise two. Did it go beyond that in your review? Well, we did not agree with, first of all, with the idea that Press Enterprises two should be used in this context. But we lost that argument on the first appeal. And so if Press Enterprise two was to be used, which is how I read the first panel's opinion, was that directing the district court to apply that. Yes. And that is what the court did on remand, held a second hearing and made findings, which I don't really understand the plaintiff to be challenging. In terms of the second prong of Press Enterprises two, or as interpreted and remanded by the first panel opinion, the plaintiff was found by the district court to have failed it at step two. And that meant that a preliminary injunction would not be appropriate because she had not shown a likelihood of success on the merits. There was a lengthy attempt to settle this case, to bring both sides to some kind of an agreement within the scope of what your agency admitted was her right of some kind of qualified access. Why did the settlement negotiations fail? What happened? How did they fall apart? Your Honor, I honestly do not know that. I was not involved in the trial court proceedings. And I think those discussions were probably under a confidentiality type of understanding. Right. But I think Judge Trott raises an interesting question, because regardless of how what happens here, you're going to come back with a new record of decision. There's going to be a new gather in that area. And this problem needs to be solved in a way, if you can. So would the assistance of the circuit mediator help you with that or not? I don't know that that ---- Because basically what you're trying to do, you're trying to come up with negotiated press access restrictions that take into consideration safety and press access, right? Well, as you point out, there were about 10 months of attempts to reach a settlement in the district court. Well, that's why I was curious why it fell apart. Because, I mean, it seems to me there's some settlement here someplace. I mean, your side agrees that she has a right to access this. And she wants a certain access that seems to be in excess of what you think is safe. And somewhere in the middle here, there's got to be some sort of common ground. I don't know what it is. But here's the way I look at the case. You take a look at these witnesses. Farley Summers, Bower, and Gardner and Lay, they all say, we used to go to these  and everything was nice and friendly. Calico is an example of everything went well. And then the other side says, my client put some bad stuff on YouTube and on the Internet showing horses in trouble. The next thing we know, the world falls in on us. This was clearly done to silence Laura Lee and others of that nature. Why doesn't this case suggest that? Well, Your Honor, I take that kind of testimony as going to the retaliation theory that this Court in the prior appeal said was the wrong way of looking at the case. That is how the district court on the first. Yeah, but these narrowly tailored restrictions seem to be some kind of an attempt simply to silence this press photographer. No, Your Honor, because they apply to everyone who wants to attend the Silver King Gather, who wanted to be at Silver King. But if that's, you know, that's not really an answer in the sense that if you're trying to prohibit people from photographing, including the plaintiff, these are the restrictions you have. The fact they apply to everybody makes no difference to me. Your Honor, the restrictions that apply to Silver King didn't prevent the plaintiff from getting photographs. If you look in the excerpts of record, you can see that she got photographs. They just weren't as unobstructed as she wanted. Yeah, they were photographs that didn't permit her to capture what she wanted to capture in order to alert the world as to what was happening. Well, Your Honor, you have to bear in mind that there were three different areas from which she could view the gather. One was at the top of a hill only 300 feet away from the trap. About as far away as I sit from a football field when I go to a football game. Well, I've sat in the end zone, and it is somewhat harder to see the action at the other end of the field, but it's not impossible. Especially, it's pretty easy, actually, if you have decent binoculars. So 300 feet away. Yes. And that was while the helicopter was in the air. When the helicopter was not in the air and the horses had had a chance to settle down inside the trap, then a BLM person would bring whoever wanted to to the second observation point, which is lower down and only 100 feet from the trap, and had a clear view of the trap, according to the findings of the district court. I have a couple questions. Why did you change the rules here? It sounds like before, at one point in time, people could access this. And I'm curious, what was the prompting? Your Honor, the testimony. Did somebody get hurt? No. The testimony was that there was increasing amounts of interest in going to horse gathers. And so whereas things might have been all right to have laxer rules when there wasn't as much public interest in going to horse gathers, there has been greater interest, and so some more formal protocols have to be put in place. And actually, there's testimony about a January 2013 protocol where the BLM at a national level, the instructional memorandum was put out. This was in January of this year. It didn't apply to the 2010 gather, but it was an attempt by BLM to more formalize things in light of the increased interest on a nationwide level in gathers. The protocol recognized that in some HMAs, herd management areas, interest may not be as great as in others. But generally speaking, there's an upward trend, and it was better to have more formalized procedures. So what administrative mechanism exists to challenge the protocol? Your Honor, I think that could be a challenge in a concrete gather as under the Administrative Procedure Act, but that's not the reason I say that, not to interrupt, but in looking at the record of decision, it doesn't contain any restrictions, per se, in the record of decision. The protocol was developed later and not subject to administrative review. Is that right? No. The protocol would, in principle, be challengeable under the APA, but in the context of a gather to which the protocol was applied. And it was not applied to the 2010 Silver King gather. And I do think that the Court would be, in terms of mootness or issues that are not fit for review at the time, I think that the Court, in reviewing these issues, would be aided by a concrete application of the protocols to another gather. Well, no doubt. The question I have on mootness is this. You know, I understand that the record of decision expires in a few weeks, but the prior panel didn't seem to think that mattered. And, of course, we can't revisit some of the we can't revisit their decision unless there's something new, whether it's intervening law or intervening fact. In your petition for your PFR that you filed in the prior case, you said, look, this expires in December 2013. You've got to clarify your decision and say that it's limited then. And the panel declined to do that and basically talked about the fact that in the future there wouldn't necessarily have to be gathers at this location. So how do we, as a subsequent panel, deal with that? Your Honor, I don't think that the prior panel foreclosed a mootness argument. In fact, I think that the mootness argument that we're making now is completely consistent because the court, the prior panel, amended its decision to make clear that this record of decision will expire on December 31, 2013. And that being the case, that there's, unless one were to completely hypothesize some sort of gathering happening at Silver King between now and the end of this year, that there's really not a do you plan one? I'm sorry? Do you plan one? No. But I assume you wouldn't. In other words, to preserve your mootness argument, you wouldn't object to an order precluding you from a gather from the remainder of the year, right? I mean, you're not going to do it anyway. See, the case isn't moot now. It will become moot. But right now we could issue a decision, and I couldn't with a straight face say it's moot now. It's not, because you have theoretical possibility of having another gather. You said you're not going to do that. So I assume that as part of any decision, you'd accept an injunction saying you can't have a gather between now and January 1, right? Well, but, Your Honor, an injunction would have to be based on some sort of reversal of the district court's decision not to issue. No, a state pending appeal. That's, you know, you could certainly say any action pending appeal. I mean, right now I credit your argument on mootness and the fact you don't think the prior panel opinion forecloses that. But in point of fact, it's not moot now. I think as we stand here, Your Honor, it's theoretically not moot. Right. But we say that it will be moot as of January 1. Because there's no planned gathers between now and January 1. Is that correct? That's right. Absent an emergency, which is by definition unforeseeable. And also, I mean, if there were to be an emergency between now and the end of this  proceeding with an emergency gather of some sort, and that would be the new decision document, will it cover things like press access, public access? The last record of decision did not, did it? No. But now we have the January 2013 protocol, which would lay down the general guidelines. So it necessarily would be part of the new process. It would be the, if there were an emergency in the next, emergency gather in the next few weeks, it would, it would be subject to the January 2013 press protocol, the instructional memorandum that I referenced earlier. And then you, the Court would have a concrete decision where that hypothetical emergency was. Well, I hope you don't call us back into session between now and the end of the year, counsel. I mean. We have certainly no intention. It's just, it's just completely speculative to think that in the next few weeks there's going to be an emergency. And I'm also told by BLM that if there were an emergency, it's not as though BLM would go out immediately and start gathering horses. I mean, they have to prepare a new decision document, and that takes some time, and they have to document the emergency and the effect that it would be having. Well, I trust you'd notify us. Absolutely, Your Honor. But, but the, the main point, though, is that, that the gather that was being challenged here happened in 2010. It was over a long time ago. The, the panel previously recognized that the authorization for the, for any more gathering would end on December 31 of this year, and there is, there's no reason to think that there is going to be a gather between now and then. I mean, certainly, Judge Thomas, as you indicated, the Court could, could issue some, some sort of order tomorrow or. The practical situation is this is hardly the end of this case in controversy. Well, I think that's, that's, that's right, Your Honor. I mean, I, we, we do believe that the preliminary injunction appeal is moot, but the, the case remains pending in the district court. And the plaintiff on remand can go back to the district court and pursue whatever claims that may still be live and, and seek, seek permanent relief, if appropriate. So you think that's the appropriate thing for the plaintiff to do? I, I think it is. Well, why, why isn't the whole case moot? After, after January of, of, after January 1, 2014, why isn't the entire case moot? Well. What do you think, what do you think's left? We, we think, we think that the, the case may well be moot, but the part of the case that may, may not be and which ought to be examined by the district court in the first instance is the, the part of the case that we really haven't discussed yet, which is distinct from the access to Silver King Gather where there's also the claim for I, I think that as we're standing here, that, that part of the claim is, is likely not moot, and the reason I say that is the, that question turns on whether the, the Broken Arrow facility still has horses from Silver King being, being kept there. And I, and I, I understand that the, the answer to that question right now is yes. So because there are horses from this 2010 gather at Silver King still being held, still being kept in short-term holding at Broken Arrow, that part of the case right now is, is very, is, is likely not moot. However, we don't know what the situation will be when the case is remanded to the district court. But what does that mean, that that part of the case is not moot? What does that mean, those horses are there after January, after December 31st? What, doesn't, I don't see how that part doesn't also become moot. That, well, I, I think that an argument can, could be made that that part of the case is not controlled by the December 31st expiration of the rod. Because that, that means that no more horses can be gathered. But it, it doesn't. It doesn't affect how you're holding the horses. It doesn't affect whether Silver King horses that have already been gathered continue to be at Broken Arrow. And by the time the court, the case goes back down to the district court, those facts may well be different from what they are now. And so that being the case, I think that that, that, that part of the case should, should on remand just be considered by the district court in the first instance, both, both to determine whether that claim is still alive, and if it is, then to, to, to make a final determination on the merits as to, as to whether there is a valid claim there. On the preliminary injunction phase of the case, the, the court, the district court separately looked at that and said there has been no history of access to the Broken Arrow short-term holding facility. And, therefore, Even though in the contract it said there would be? Well, Your Honor, the, the contract was never entered into evidence. And I don't, I don't know what the contract says. I don't, I doubt that the contract says. Represented that it does allow public access, but if it's not in the record, it's not in the record. It's, it wasn't introduced into evidence. Apparently, Plaintiff had a copy of it and spoke about it in her, in her life testimony, but the contract itself was not entered into evidence. We don't know that it mandates that Broken Arrow be kept open to public tours for the term of the contract. We just don't know one way or the other. But what the district court did find was that based on the evidence it had heard at the second preliminary injunction hearing, that facility was never designed to be open to the public. It's not an adoption facility. BLM itself runs the adoption facility called Palomino Valley, which is open to the public, has very broad public visitation hours, daily, I believe, and Saturdays. But as far as Broken Arrow was concerned, the only time that it had been open to the public was at a specific gather that had a great deal of interest, I guess, in adopting horses, the Calico Gather. But apart from that, once Calico was over, the district court found, the interest had waned. It was vacillating. It was expensive for the government to keep it open when there, to public tours when there wasn't really the interest. And so shortly after Calico, the public tours ceased. And viewing the facts that were put before the district court, it was not able to find that plaintiff met its burden at step one of the Press Enterprises II test. And I don't understand plaintiffs to be arguing now that there was anything clearly erroneous about that finding. If we sit down, would you address the capable of repetition but evading review exception to mootness? Certainly, it would appear that this controversy is not only going to be repeated. I gather the government's position is you've got to have a gather and you have to be restricted at that particular gather before you can raise this issue. But it's pretty tough to litigate that after the gather because the harm is already done. So how do you address that exception to mootness? Well, Your Honor, I would point out, I mean, there are two prongs, capable of repetition but also evading review. Evading review. And it's supposed to be a, the Court has said that this is an extraordinary or a special circumstance, special exception, an extraordinary exception to the mootness doctrine. And here, I think probably of the two prongs, the easier one to think of this in terms of is evading review. I mean, the R.O.D. authorized this activity for three and a half years. Right, right. But the protocols were separate from the R.O.D. In other words, the restrictions on press access or public access were separate from the R.O.D. And if I misinterpreted what you said earlier, let me know. But I thought you were saying you have to wait until a specific gather and the restrictions are put in place for that gather for the plaintiff to have a right those weren't your words, but to have a right to go back into court to argue press enterprise. Well, yes, Your Honor, I was going to say. And so how would that go ahead? I was making that argument in terms of why the 2010 Silver King dispute is moot, but why it would be better for the Court to review any future disputes in the context of a concrete future. Right. But it's pretty difficult for us or a district court to intervene in the middle of a wild horse gather to decide whether or not those protocols are appropriate. So, in fact, he has a — I think they have a point in saying this is a — this could be seen as evading review, particularly given the course of this case. Well, again, Your Honor, I think the Court has recognized that if three years is not enough, is sufficient not to evade review. In American Rivers, this rod was good for three and a half years. That shouldn't evade review. I think also — this isn't cited in our brief because it was raised in the reply brief for the first time by the plaintiffs, but in the Headwaters case, there's a case, Headwaters v. Bureau of Land Management, 893 F. 2nd. 1012 at 1016, Ninth Circuit, 1990. The Court points out that, quote, where prompt application for stay-pending appeal can preserve an issue for appeal, the issue is not one that will evade review. And I think that that's important here because, to the extent that in a future gather, the plaintiff felt that she wasn't getting the unobstructed view — unobstructed view that she wanted or wasn't allowed close enough, she could go into district court, and if the district court did not afford relief, seek a stay-pending appeal. Right. But the substitute in the middle of a gather is my point. Well, I don't know why that would be, Your Honor. I mean, oftentimes people — plaintiffs come into court. The more typical, I think, in my experience anyway, is that a timber sale will have to be a preliminary and join the timber sale. Right. But if — go ahead. It's not — it's certainly not — maybe it's not the ideal way of proceeding, but it's certainly a mechanism that is well-known. In the timber sale cases, for example, if the district court declines to issue a preliminary injunction, the plaintiff often comes to this court for a stay-pending appeal, sometimes on an emergency basis. But the Court is well-suited to handling those kinds of situations. And when you're saying there's a hill in front of me and I can't see the horses, it's a whole different situation from saying we need to stop the timber sale because it's going to endanger the species. The two are somewhat dissimilar. But my questions have taken you over your time. Any further questions? No. Thank you. Thank you. Do you have about two minutes left for rebuttal? Thank you, Your Honor. I did find a case that Your Honor, you asked about. And it just basically says it's vague out there, but I'm going to give it to you. It's a First Amendment or First Circuit Court case. It is as a good discussion. Boston Herald, Inc., 321 Fed 3rd, 174. And the discussion is that pages 182 to 189, it's a 2003 opinion from the First Circuit. But what's the what in relation to what I asked a couple of questions. You asked a question about, gee, you know, do we apply, you know, modern access rules, or gee, did the First Amendment have to be around, or did Ms. Lee have to be alive at the time the First Amendment was published? And so I think that that gives you a good history. It doesn't give you a finite answer, but it's the best I can do. In a short period of time, I had to answer that question for you. Well, nobody says that Ms. Lee has to be around the time of the First Amendment. And then I was involved heavily with the settlement discussions. We don't want to know the content. We just want to know if there's any chance. Right. The only issue there was that there were two cases tied together, and there was a refusal to go beyond that, as opposed to just separating one out. Right. Well, I mean, the question for you is, and because you participate, you can answer it, is do you think settlement would be fruitful at this stage or not? Are the parties to the point where you really can't agree? You know, I can tell you from my client's viewpoint is she would be elated if she could settle this case. All right. It's not an issue about marriage. Yeah, we don't need to know the marriage. Who managed the mediation that failed? Anybody? No, other than top individuals were involved from the BLM. I'm not saying it was Ken Salazar. But there was no circuit mediator. We tried to get a mediator in place, and that fell apart as well. How did that fall apart? Private mediator? Yes. Private mediator. And that fell apart as well. All right. Thank you, counsel. Thank you. The case is here to be submitted for decision.
judges: Trott, Thomas, Murguia